**Keith WIDDER, Petitioner,**

v.

**DURANGO SCHOOL DISTRICT NO. 9–R, a Colorado school district; and Board of Education of Durango School District No. 9–R, a Colorado school district board of education, Respondent.**

No. 02SC497.

Supreme Court of Colorado,
En Banc.

Feb. 23, 2004.

As Modified on Denial
of Rehearing March 15, 2004.

Colorado Education Association, Sharyn E. Dreyer, Martha R. Houser, Gregory J. Lawler, Cathy L. Cooper, Charles F. Kaiser, Denver, Colorado, Attorneys for Petitioner.

Semple, Miller & Mooney, P.C., Patrick B. Mooney, Denver, Colorado, Attorneys for Respondent.

Ken Salazar, Attorney General, Alan J. Gilbert, Solicitor General, Frank R. Johnson, Assistant Attorney General, Environmental Quality Unit, Natural Resources and Environment Section, Denver, Colorado, Attorneys for Amicus Curiae for the State of Colorado.

Halpern Clancy, L.L.C., Alexander Halpern, Boulder, Colorado, Attorneys for Amici Curiae Colorado Association of School Boards and Colorado Association of School Executives.

Justice KOURLIS delivered the Opinion of the Court.

## I. Introduction

In 1984, the Colorado General Assembly enacted a provision requiring every school district to adopt a discipline code to "deal with disorderly students in a manner which allows other students to learn in an atmosphere which is safe, conducive to the learning process, and free from unnecessary inter-

ruption."[1]  In 1991, the General Assembly declared that "[a] teacher or any other person who acts in good faith and in compliance with the discipline code adopted by the board of education ... shall not have his contract nonrenewed or be subject to any disciplinary proceedings, including dismissal, as a result of such lawful actions."[2]  Two years later, the General Assembly added the requirement that each discipline code be in writing and include, among other things, "policies and procedures for the use of acts of reasonable and appropriate physical intervention or force in dealing with disruptive students."[3]

In the spring of 1999, Petitioner Keith Widder (Widder) was terminated from his job as a custodian for the Durango School District (the District), following pre-termination proceedings at the District level.  He claims that the termination violated section 22–32–110(4)(c), 7 C.R.S. (1999), the provision in place at that time protecting teachers and other persons from dismissal for acts taken in good faith and in compliance with a school district's discipline code.[4]  Widder filed an action in the district court seeking relief on that basis.  Following a de novo hearing, the trial court found that Widder's termination violated the statute, and thus ordered reinstatement and back pay with statutory interest.

The court of appeals vacated the trial court's order, concluding that the trial court erred in conducting a de novo hearing to determine whether Widder was discharged in violation of section 22–32–110(4)(c), and should rather have deferred to the District's findings and conclusions.  *Widder v. Durango Sch. Dist. No. 9–R*, 60 P.3d 741, 743 (Colo.App.2002).

The issue before us in this case is whether the General Assembly intended to supercede a school district's authority to make the decision, in the first instance, about whether an employee's actions were consonant with school district policies.  Specifically, we granted certiorari to determine whether a school district employee who was dismissed for cause is entitled to judicial review of the School Board's determination that his conduct was not protected under the statute; and if so, what the correct standard of review should be.  We now affirm in part, reverse in part, and remand with instructions to return the case to the District in order to make findings of fact and enter conclusions of law responsive to the principles set forth in this opinion.

## II.  FACTS

Keith Widder was a custodian at Miller Middle School in Durango, Colorado.[5]  On April 29, 1999, Widder intervened in an incident between two boys, in which one of the boys was pushing the other.  Widder squatted down in front of the boy whom he perceived to be the aggressor and struck the boy with his own forehead—or "head-butted" him.  Widder then told the boy that "[t]here's always someone bigger then you.  Now get out of here."  After that comment, the boys walked away and Widder returned to the boiler room.

A few minutes after the incident, the boy went to Marc Cooper, the Assistant Principal of Miller Middle School, and reported that Widder had "head-butted" him.  Meanwhile, Widder contacted his attorney before informing anyone from the school about what had happened.  Fifteen minutes after the incident, Assistant Principal Cooper summoned

1.  Ch. 158, sec. 1, § 22–32–110(2), 1984 Colo. Sess. Laws 597, 597.

2.  Ch. 91, sec. 1, § 22–32–110(4)(c), 1991 Colo. Sess. Laws 529, 530.

3.  Ch. 128, sec. 1, § 22–32–110(2)(b)(IV), 1993 Colo. Sess. Laws 449, 450.

4.  In 2000, following the tragedy at Columbine High School, the General Assembly repealed and reenacted section 22–32–110(4)(c) in essentially unaltered form as part of "An Act Concerning Safe Schools."  This provision is now codified

under section 22–32–109.1(9)(e), 7A C.R.S. (2003).  Ch. 374, sec. 1, § 22–32–109.1(9)(e), 2000 Colo. Sess. Laws 1957, 1963.  Because the recodification was in a different overall format, we use the 1999 statutory references throughout this opinion to avoid any confusion.

5.  Because we ultimately conclude that the district court should not have held a de novo hearing, we do not rely upon facts that come from that setting, but rather from facts that were clearly before the District.

Widder to his office. At that meeting, Widder admitted to bumping heads with a student and stated that he "certainly could have handled [the situation] better." Widder declined to make a written statement.

On the same day as the incident, Widder received a letter from Copper Stoll, the principal at Miller Middle School. That letter informed Widder that he was suspended without pay pending an investigation of the incident at 9:45 a.m. on April 29, 1999, and that such suspension was in compliance with the DSPA Master Agreement (a collective bargaining agreement between the Durango Support Personnel Association and the District). The letter also indicated that depending upon the outcome of the investigation, there could be additional disciplinary action including termination.

An investigation took place, and on May 20, 1999, the Interim Superintendent of the District, Dr. Joel Jones, sent Widder a letter advising him that Jones would be recommending to the Board of Education that Widder's employment be terminated effective June 3, 1999. Dr. Jones stated that the basis for his recommendation was the investigative report conducted by the District concluding that Widder made "inappropriate physical contact with the child in question." Dr. Jones notified Widder that he was entitled to a hearing provided that he request the hearing within three days of the notice by contacting Jones in writing or by telephone. The letter further indicated that Widder would be entitled to representation at the hearing.

Pursuant to the DSPA Master Agreement, referred to in the initial suspension letter, Widder was entitled to certain pre-termination procedures. He was entitled to, and received, a copy of the complaint, information regarding the procedures used in the investigation and the ultimate resolution from the investigation. He was also entitled to, and received, two weeks' notice of termination and an opportunity to request a hearing. Lastly, he was entitled to, and received, a hearing before the Superintendent or his or her designee, at which he was present and represented by counsel. The contract required that the Superintendent or his or her designee make findings of fact and render a decision. The DSPA agreement also outlined certain prohibited reasons for termination, such as unlawful discrimination on the basis of race, creed, color, national origin, sex, marital status, age, disability, veteran's status or membership or non-membership, or participation or non-participation in the activities of the employee organization. Widder does not contend that the procedures set forth in the contract were in any way abrogated. Therefore, although Widder may have been an at will employee with respect to the absence of a "for cause" provision in his contract, he was contractually entitled to pre-termination process that would not apply to a purely at will employee,[6] and there were certain reasons for which he could not be terminated: some of which were outlined in the contract itself, and some of which fall under statutory or constitutional mandate.

## A. ADMINISTRATIVE PROCEEDINGS

Widder's hearing occurred on July 9, 1999. He was represented by counsel. Dr. Judy Michalski, the Interim Superintendent for the District from June to July of 1999, presided over the hearing. Widder appeared but chose not to testify. Rather, Widder's attorney spoke on his behalf and submitted a notebook of documents for Michalski's consideration. Michalski also considered written statements of the two involved students. There was no transcribed record made of the hearing.

After the hearing, Michalski issued a one-page memorandum outlining the evidence presented at the hearing and her findings based on that evidence. She recited ten items of evidence that she had reviewed, including: statements from students and teachers; administrative policies on Exclusions, Corporal Punishment, Suspension/Expulsion of Students; the investigative report;

---

6. The contract does provide that, in the interests of fairness, all disciplines and terminations will be subject to the pre-termination procedures.

and a statement from Widder.[7] Dr. Michalski found the following:

> After reviewing the above documentation and listening to the arguments, statements, and questions. My findings are as follows: to uphold Dr. Joel Jones [sic] recommendation of termination based on the evidence that there was a headbut and that, based on my assessment of the credibility and weight of the evidence, it was deliberate or the result of Widder's inappropriate conduct.

Dr. Michalski submitted her recommendation to the Board of Education. The Board of Education approved Michalski's recommendation and Widder's employment with the District was terminated.

## B. TRIAL COURT PROCEEDINGS

Following his termination, Widder filed a complaint in the District Court for La Plata County. Widder's allegations against the District included a breach of contract claim and a claim based on the District's violation of section 22–32–110(4)(c).

■■■ The District moved for judgment on the pleadings pursuant to C.R.C.P. 12(c). The trial court granted the District's motion. Specifically, the trial court ruled that Widder failed to allege facts to support an implied contract claim. Further, the trial court ruled that a violation of section 22–32–110(4)(c) did not create a private right of action. However, the trial court, relying on *McIntosh v. Board of Education*, 999 P.2d 224 (Colo.App. 2000), held that Widder could seek relief in the nature of mandamus pursuant to C.R.C.P. 106(a)(2).[8] Widder was permitted to file an amended complaint alleging that he was damaged by the board's failure to comply with section 22–32–110(4)(c). Widder then filed an amended complaint and the

District moved for summary judgment. The trial court rejected the District's argument that the School Board's decision to terminate Widder was only reviewable for abuse of discretion and denied summary judgment. Rather, the trial court, relying on *McIntosh*, held that whether Widder was discharged in violation of the statute was an issue to be heard de novo by the court.

After an evidentiary hearing, the trial court ruled from the bench in favor of Widder. The trial court determined that Widder acted in good faith and that his actions were in compliance with the District's Conduct and Discipline Code, which was entered into evidence. The trial court ordered that Widder be reinstated and awarded back pay plus statutory interest.

## C. COURT OF APPEALS PROCEEDINGS

The court of appeals vacated the trial court's judgment and remanded the case with instructions to reinstate the School Board's order terminating Widder. The court of appeals held that the trial court erred in determining de novo the facts underlying Widder's mandamus action. *Widder*, 60 P.3d at 743. The court of appeals recognized that section 22–32–110(4)(c) prevented the District from dismissing an employee if his or her conduct was in good faith and in compliance with the Conduct and Discipline Code. *Id.* at 744. However, the court of appeals rejected Widder's argument that section 22–32–110(4)(c) divests the School Board of its ultimate discretion to determine whether an employee's actions were taken in good faith and in compliance with the District's Conduct and Discipline Code. *Id.* Rather, the court of appeals determined that where a decision to terminate was based on the interim superintendent's finding, after an

---

7. Because Widder did not seek relief pursuant to a procedure that would have entailed trial court review of Michalski's findings and conclusions, he never submitted to the trial court all of the documents upon which Michalski relied. Hence, we do not have all of them in the present record.

8. Mandamus is an extraordinary remedy which may be used to compel performance by public officials of a plain legal duty imposed upon them by virtue of the office that they hold. *Sherman v.*

*City of Colorado Springs Planning Comm'n*, 763 P.2d 292, 295 (Colo.1988). In *Gramiger v. Crowley*, 660 P.2d 1279, 1281 (Colo.1983), we established a three-part test that must be satisfied before a court will issue mandamus: (1) the plaintiff must have a clear right to the relief sought; (2) the defendant must have a clear duty to perform the act requested; and (3) there must be no other remedy available. *Id.*

evidentiary hearing, that the employee had engaged in deliberate or inappropriate conduct, that decision should be upheld under C.R.C.P. 106(a)(4) review.[9] *Id.*

## III. ANALYSIS

### A.

The specific statute that we are called upon to interpret appears in the portion of Title 22 of the Colorado Revised Statutes dealing with School District Boards—Powers and Duties. Included within that title is section 22–32–110(2)(a), 7 C.R.S. (1999), in which the General Assembly declares that "every student in a public school . . . has the right to learn in an environment which is safe, conducive to the learning process, and free from unnecessary interruption." To further this objective, section 22–32–110(2)(a) also requires that every school district adopt a conduct and discipline code. Each conduct and discipline code must include, among other things, "[p]olicies and procedures for the use of acts of reasonable and appropriate physical intervention or force in dealing with disruptive students." § 22–32–110(2)(b)(IV), 7 C.R.S. (1999).

Subsection (4) of section 22–32–110 provides protection from civil or criminal liability to individuals or boards acting in good faith while carrying out the provisions of a conduct and discipline code. Subsection (4)(a)(II) spells out the specifics of immunity from civil liability;[10] subsection (4)(a)(III) does the same with respect to criminal actions; and subsection (4)(b) provides that an act of a teacher or other person will not be considered child abuse if performed in good faith and in compliance with a conduct and discipline code. The particular subsection which concerns us here deals with protection from adverse employment decisions, and reads in pertinent part as follows:

A teacher or any other person who acts in good faith and in compliance with the discipline code adopted by the board of education . . . shall not have his contract nonrenewed or be subject to any disciplinary proceedings, including dismissal, as a result of such lawful actions, nor shall the actions of such person be reflected in any written evaluation or other personnel record concerning such person.

§ 22–32–110(4)(c).

Unlike the sections of the statute that provide immunity from civil or criminal liability for actions taken in good faith and in compliance with a conduct and discipline code, the section dealing with protection from adverse employment action contains no implementing provisions. In the context of civil liability, subsection (4)(II) states that "[t]he court shall dismiss any civil action resulting from actions taken by a teacher or any other person pursuant to the discipline code upon a finding *by the court* that the person acted in good faith and in compliance with such discipline code." (emphasis added). Similarly, in the context of criminal immunity, subsection (4)(III) states that "it shall be an *affirmative defense* in [a] criminal action that the teacher or such other person was acting in good faith and in compliance with the discipline code." (emphasis added). Absent such direction in the employment setting, it falls to us to give effect to the protection in the way we believe most closely implements the legislative intent.

We begin by noting that section 22–32–110(4)(c) appears in proximity to provisions granting immunity from civil and criminal liability. Immunity when considered in the context of being free from civil liability or criminal prosecution for an action taken to enforce school discipline makes perfectly good sense. On the other hand, immunity is

9. C.R.C.P. 106(a)(4) provides a mechanism for judicial review of any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions. The rule limits judicial review to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer. C.R.C.P. 106(a)(4)(I).

10. In 2003, the General Assembly enacted section 22–12–101, et seq., 7A C.R.S. (2003) (titled the "Teacher and School Administrator Protection Act"). Ch. 154, sec. 1, §§ 22–12–101–109, sec. 2, 2003 Colo. Sess. Laws, 1216, 1216–19. These provisions further implement the General Assembly's goal of shielding educational institutions and their employees from civil liability.

not a term that is often used with reference to employment decisions.[11]

Black's Law Dictionary, 752 (7th ed.1999), defines "immunity" as: "[a]ny exemption from a duty, liability, or service of process; esp., such an exemption granted to a public official." The use of the term immunity in connection with employment decisions is somewhat anomalous. Indeed, even when the General Assembly is dealing with such fundamental employment issues as protection from termination for reasons of disability, race, creed, color, sex, age, national origin or ancestry, it categorizes those protections as discriminatory or unfair employment practices—not immunities. *See* § 24–34–402, 7B C.R.S. (2003). Accordingly, the proximity of section 22–32–110(4)(c) to other provisions granting immunity does not provide much assistance in our analysis. Rather, we view section 22–32–110(4)(c) in the broader context of a school board's powers and duties, and, in that context, as an exception to a school board's discretion in the area of hiring and firing.

Because it is the seminal legislation that addresses the employment of teachers in public schools, we look to the Teacher Employment, Compensation, and Dismissal Act of 1990, § 22–63–101, et seq., 7A C.R.S. (2003) (the TECDA), for any guidance it can provide by way of analogy. The TECDA pertains primarily to non-probationary, or tenured, teachers—the class of individuals who have the most employment protection in public schools. It enumerates the specific grounds that justify the dismissal of teachers, and the procedures to be followed for the purpose of ensuring "that the educational system of the state of Colorado is being served by the best teachers available while at the same time allowing such teachers the academic freedom necessary to provide the best education possible." § 22–63–102. The TECDA also enumerates various reasons that may not serve as the basis for termination, similar to the statement in section 22–32–110(4)(c) that actions taken in good faith

and in compliance with a conduct and discipline code may not serve as the basis for dismissal. § 22–63–301, 7A C.R.S. (2003).

■ The statutory protection at issue in this case is in one way broader than the TECDA in that it covers all employees of the school district rather than just tenured teachers. Conversely, the protections and procedures it provides are in no way as specific as the TECDA. Both statutes implement public policy. The clear public policy of the statute at issue in this case is to encourage educators and school employees to intervene in situations involving disruptive behavior, violence, and bullying in school. All actions in intervention must, however, be in compliance with a "conduct and discipline code ... which is based upon the principle that every student is expected to follow accepted rules of conduct and to show respect for and to obey the persons in authority in the school." § 22–32–110(2)(a).

Also, section 22–32–110(4)(c), like the TECDA, provides a limitation on a school board's power to dismiss its employees. However, the TECDA, unlike section 22–32–110(4)(c), sets forth procedural mechanisms to protect those teachers and the academic freedom that they represent. § 22–63–302, 7A C.R.S. (2003). These procedures include, but are not limited to: (1) written notice; (2) a hearing; (3) an impartial hearing officer; (4) an audiotaped recording of the hearing and written transcripts upon request; and (5) judicial review by the court of appeals that is based on the record before the hearing officer for the purpose of determining whether the actions of the school board were arbitrary or capricious or legally impermissible.

We take from the comparison between section 22–32–110(4)(c) and the TECDA the observation that if the General Assembly had intended section 22–32–110(4)(c) to trigger a set of complex procedural safeguards for employees like Widder similar to those of the

11. The statute at issue in this case currently appears in a subsection entitled "Immunity", but such heading is absent from the earlier version. *Compare* § 22–32–110(4)(c), 7 C.R.S. (1999) *with* § 22–32–109.1(9)(e), 7A C.R.S. (2003). Thus, even if we were to afford importance to the heading, it would have to be on the basis of later-inferred legislative intent—not contemporaneous legislative intent.

TECDA, they would presumably have so directed.

### B.

As we have noted, we interpret section 22–32–110(4)(c) as an exception to the powers that otherwise reside with school boards. Section 22–32–110(1)(h), 7A C.R.S. (2003), grants boards of education the specific power, as exercised in its judgment, "[t]o discharge or otherwise terminate the employment of any personnel."

■ Widder was an employee who had no right to continued employment, and who could be discharged without cause. He did, as noted above, have certain contractual rights not normally associated with at will employees. Traditionally, the law has accorded employers, including government agencies, broad discretion in the discharge of employees who are terminable at will. *Fremont RE–1 Sch. Dist. v. Jacobs,* 737 P.2d 816, 820 (Colo.1987). The general rule is that, absent a violation of constitutional rights, judicial review is not available to second-guess the firing of an employee who is terminable at will. *Id.* Such an employee may be dismissed without cause. *Id.; see also Adams County Sch. Dist. No. 50 v. Dickey,* 791 P.2d 688, 691 (Colo.1990) (because at will employees may be terminated without cause and without notice, termination does not give rise to a cause of action). Absent statutory or contractual requirements, at will employees are not even entitled to notice or a hearing when facing dismissal.

The fact is that the District was free to dismiss Widder without cause, unless such dismissal violated section 22–32–110(4)(c) (or some other statutory or constitutional provision)—or abrogated the terms of his contract.

Here, although no statute required pre-termination process, it is undisputed that the DSPA Master Agreement provided for such procedures, and that Widder did receive no-

tice and a hearing before Michalski at which he was represented by counsel.[12]

### C.

■ The School Board is a separate entity, with duties to administer its School District and to enforce applicable statutes, rules and policies. When a party seeks court oversight of the activities of such a governmental entity, it is Rule 106 of the Colorado Rules of Civil Procedure that sets forth the framework of such review. Here, that rule contains both the remedy that Widder urges and the remedy that the District urges.

C.R.C.P. 106(a)(2) provides in pertinent part that when an individual seeks to "compel a lower judicial body, governmental body, corporation, board, officer or person to perform an act ... or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded," the person may seek mandamus relief in district court. Rule 106(a)(2) contemplates that the court may compel a judicial or administrative body to perform an act which the law specifically requires or enjoins.

■ On the other hand, C.R.C.P. 106(a)(4) provides judicial review of a decision of any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions for the purpose of determining whether the body or officer exceeded its jurisdiction or abused its discretion. This Rule does not contemplate a new evidentiary hearing at the district court level, but rather contemplates that the district court will review the record of the proceedings conducted elsewhere and determine whether the acting entity abused its discretion or exceeded its jurisdiction. Rule 106(a)(4), in contrast to Rule 106(a)(2), honors the decision of the other governmental entity absent such abuse of discretion. Abuse of discretion means that the decision under review is not reasonably supported by any competent evidence in the record. *Van Sickle v. Boyes,* 797 P.2d 1267, 1272 (Colo.1990). A record lacking any

---

**12.** We note that we do not have the situation before us today where no hearing was conduct-   ed.

competent evidence means that the ultimate decision of the administrative body is so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority. *Id.*

Widder maintains that the decision by the School Board as to whether or not his actions were taken in good faith and in compliance with the Conduct and Discipline Code is not susceptible to the limited review provided by C.R.C.P. 106(a)(4) because the decision was not quasi-judicial in nature. In support of his position, Widder cites to *City and County of Denver v. Eggert,* 647 P.2d 216 (Colo.1982). In *Eggert,* this court applied a test for determining whether an agency was deemed to have exercised a quasi-judicial function. The *"Snyder"* test discussed in *Eggert* was originally formulated in *Snyder v. City of Lakewood,* 189 Colo. 421, 542 P.2d 371 (1975), *overruled in part by Margolis v. Dist. Court,* 638 P.2d 297 (Colo.1981), where we held that the action of an agency will be deemed quasi-judicial for C.R.C.P. 106(a)(4) purposes if: (1) a state or local law requires that the body give adequate notice to the community before acting; (2) a state or local law requires that the body conduct a public hearing, pursuant to notice, at which time concerned citizens must be given an opportunity to be heard and present evidence; and (3) a state or local law requires the body to make a determination by applying the facts of a specific case to certain criteria established by law. *Id.* at 374.

Widder argues that because there is no state or local law requiring notice and a hearing, a school board's determination cannot be characterized as quasi-judicial and therefore judicial review under C.R.C.P. 106(a)(4) is not the appropriate procedure for obtaining judicial review. We disagree.

▇ In *Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.,* 757 P.2d 622, 626 (Colo.1988), we expressly rejected Widder's argument that unless a notice and hearing is mandated by statute, an agency's action cannot be characterized as quasi-judicial in nature. We went on to state:

> *Eggert* thus clearly stands for the proposition that it is the nature of the decision rendered by the governmental body, and not the existence of a legislative scheme mandating notice and a hearing, that is the predominant consideration in determining whether the governmental body has exercised a quasi-judicial function in rendering its decision.

*Id.* at 627. In *Cherry Hills,* we recognized that the existence of a statute or ordinance mandating notice and a hearing is "a clear signal that the governmental decision is to be regarded as quasi-judicial for the purpose of judicial review under C.R.C.P. 106(a)(4)." *Id.* However, those factors are not the *sine qua non* of quasi-judicial action. Rather, we stated:

> The central focus, in our view, should be on the nature of the governmental decision and the process by which that decision is reached. If, for example, the governmental decision is likely to adversely affect the protected interests of specific individuals, and if a decision is to be reached through the application of preexisting legal standards or policy considerations to present or past facts presented to the governmental body, then one can say with reasonable certainty that the governmental body is acting in a quasi-judicial capacity in making its determination.

*Id.*

▇ Thus, in determining whether a school board is performing a quasi-judicial function, our inquiry must focus on the nature of the governmental decision and the process by which that decision is reached. *Sherman v. City of Colorado Springs Planning Comm'n,* 763 P.2d 292, 295–96 (Colo. 1988). "Quasi-judicial" decision making, as its name connotes, bears similarities to the adjudicatory function performed by courts. *Cherry Hills,* 757 P.2d at 625–26.

A school district's decision about whether to terminate an employee who claims that he acted in good faith and in compliance with a conduct and discipline code certainly involves a determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing standards (i.e. the conduct and discipline code) to past or present facts. The clear questions to be resolved are: (1) what did the employee

do; (2) was such action undertaken in good faith; and (3) was such action in compliance with the conduct and discipline code of the school district?

The existence or absence of an adequate record is not pivotal in determining whether the decision itself was quasi-judicial. Indeed, under C.R.C.P. 106(a)(4)(IX), the court may decide that the record is inadequate because it does not contain findings of fact or conclusions of law necessary for a review of agency's action, and thus may remand the case back to the governmental body. That Rule states:

> In the event the court determines that the governmental body, officer or judicial body has failed to make findings of fact or conclusions of law necessary for a review of its action, the court may remand for the making of such findings of fact or conclusions of law.

*See also Bd. of County Comm'rs of Larimer County v. Conder*, 927 P.2d 1339, 1350 (Colo. 1996) (Where a board fails to make adequate findings in the record, it is appropriate for the trial court to remand the case to the board with directions to make findings of fact or conclusions of law necessary for the subsequent review of its action.).

### D.

The Board's decision to terminate Widder was a quasi-judicial decision that is properly reviewed under Rule 106(a)(4). [13] The Board acted on Acting Superintendent Michalski's recommendation that Widder be terminated because of his inappropriate conduct with a student. As we explained in detail earlier in

this opinion, Michalski reached that conclusion after conducting an adjudicatory hearing and considering the evidence presented at that hearing. Widder had advance notice of the hearing, and was given the opportunity to be represented by counsel and to present evidence at the hearing.

◼ We thus turn to the record we have of the hearing before Michalski to determine whether, under Rule 106(a)(4), her findings and conclusions are adequate and whether there is evidence to support them. The record of that hearing is sparse. We have Michalski's written findings, which do not make specific reference to section 22–32–110(4)(c) or to the specific provisions of the conduct and discipline code that were applied by Michalski in this case. We have a list of the evidence she considered, but we do not have those attachments. Some of them may have been admitted into evidence at the de novo hearing before the district court, but we have no conclusive evidence of what Michalski herself considered.

◼ Additionally, Michalski never addressed the relevant issues of Widder's good faith and his compliance with the conduct and discipline code. Indeed, the record of that proceeding does not even include a copy of the District's conduct and discipline code.[14] Specifically, there should have been findings of fact and conclusions as to whether Widder was acting in good faith and whether his actions were indeed in compliance with Rule

---

**13.** We do not view C.R.C.P. 57 as an appropriate vehicle to review the District's decision because it affords no deference to the District's interpretation of its own policy: the conduct and discipline code. It is not the statute that is at issue in the termination decision, but rather the code, and the District should be entitled to some autonomy in applying that code—provided that its decision is supported by evidence in the applicable record. *See Van Pelt v. State Bd. for Cmty. Colleges and Occupational Educ.*, 195 Colo. 316, 577 P.2d 765, 770 (1978)("An administrative agency's construction of its own regulations is generally entitled to great weight unless it is plainly erroneous or inconsistent with the regulations."); *Orsinger Outdoor Adver., Inc. v. Dep't of Highways*, 752 P.2d 55, 66 (Colo.1988)("An administrative agency's construction of its own regulation is entitled to great weight especially when

... the regulation is promulgated pursuant to an explicit legislative grant of regulatory authority. ....").

**14.** The District argued that the conduct and discipline code was not relevant to Michalski's determination because Widder admitted that he had not seen it. However, Widder did assert general familiarity with the fact that there was a code and that it authorized "reasonable force" to prevent bullying. Nonetheless, because the statute provides that the employee is protected from termination if he was acting in good faith and in compliance with the code, the pertinent inquiry is not Widder's subjective understanding of the code but whether his conduct was both in good faith and in compliance with the code.

16.1, the portion of the code which Widder cites.

Rule 16.1 of the District's code provides:

Any persons employed by the district may, within the scope of his employment, use reasonable and appropriate physical intervention or force when reasonably necessary, e.g.:

16.1.1 To restrain a student from an act of wrong-doing.

16.1.2 To quell a disturbance threatening physical injury to others.

16.1.3 To obtain possession of weapons or other dangerous objects upon a student or within the control of a student.

16.1.4 For the purpose of self-defense.

16.1.5 For the protection of persons or property.

16.1.6 For the preservation of order.

Absent such findings and conclusions, a court cannot undertake an appropriate review. A school board must make the initial determination of whether the employee's actions were taken in good faith and in compliance with the internal regulations implemented by each school district. Only after that determination is made is it even possible to conclude whether the statutory protection from dismissal is triggered. If an employee engages in a particular act that the employee contends is protected under section 22–32–110(4)(c), and the school district dismisses the employee for that very act, then the first question must be what the school district's conduct and discipline code states, and whether the employee's action comported with it.

The issue here is not whether school boards are entitled to determine for themselves whether an employee is protected by the statute. Rather, school boards, through the application of their conduct and discipline codes, must make findings of fact and enter conclusions. Michalski's one-page memorandum provides an insufficient record to allow a court to conduct meaningful judicial review as to whether the School Board abused its discretion.

Because the District failed to make those determinations in this case, we cannot merely require Widder to certify the record of documents upon which Michalski relied in reaching her decision and review that record for adequacy. Rather, the case must be remanded back to the District under C.R.C.P. 106(a)(4)(IX) for that purpose. *See Bd. of County Comm'rs v. Salardino,* 136 Colo. 421, 318 P.2d 596, 597–99 (1957) (When reviewing a decision by a board where there is no record regarding what occurred at a hearing, no judicial determination can be made as to whether the board acted within its discretion and, under those circumstances, it is appropriate to remand to the board for further hearings.); *Save Park County v. Bd. of County Comm'rs,* 990 P.2d 35, 38–39 (Colo. 1999) (Where there is insufficient material in the record to allow for meaningful appellate review, it is proper to remand to a board for further hearings.). The District must make findings and enter conclusions responsive to the issues addressed herein. The employee may then seek relief pursuant to C.R.C.P. 106(a)(4), by certifying the record of that proceeding over to the district court for its review.

We therefore affirm the court of appeals' decision that de novo review was not appropriate. School boards, not courts, retain discretion over their employees and over the enforcement of their own conduct and discipline codes, absent a showing of abuse. We do not, however, agree with the court of appeals' reinstatement of the termination order. The record is inadequate to allow the trial court or this court to determine the basis for the District's decision and whether that basis violated the statute. The appropriate remedy is to remand the matter to the District to correct that deficiency, such that the district court may then engage in the limited review contemplated by Rule 106(a)(4).

## IV. CONCLUSION

We believe our decision today implements section 22–32–110(4)(c), while still affording appropriate discretion to school boards. The handling of conduct and discipline code issues is uniquely suited, at least in the first instance, to the authority of the District. It is the District that bears the day-to-day and

immediate responsibility for assuring that its schools do remain safe and conducive to learning. Therefore, we affirm in part, reverse in part, and remand with instructions to return the case to the District in order to make findings of fact and enter conclusions of law responsive to the principles set forth in this opinion.

Justice RICE dissents, and Justice HOBBS and Justice BENDER join in the dissent.

Justice RICE dissenting.

At issue in this case is whether a statute intended to protect school employees from dismissal by the school district board of education (the "School District" or "District"), based on an employee's action purportedly taken in good faith and in compliance with the District's discipline code, allows the District itself to determine whether the employee's conduct is so protected. The majority today answers that question in the affirmative, providing for only the most deferential review of the District's decision. Because I believe that this result renders the underlying statute virtually meaningless, I respectfully dissent.

In 1991, Colorado's General Assembly passed into law "A Bill for an Act Concerning the Protection of Persons Acting in Good Faith Under the Discipline Code Adopted by a School District." H.B. 91–1203, 58th Gen. Assemb.; Reg. Sess. (Colo.1991); § 22–32–110(4), 7 C.R.S. (1999) (the "Immunity Statute" or the "Statute").[15] The Immunity Statute shields School Districts and their employees from civil and criminal liability arising out of actions taken in good faith and in compliance with the District's state-mandated discipline code. § 22–32–110(4)(a)(I)–(III). Additionally, the Statute provides as follows:

> A teacher or any other person who acts in good faith and in compliance with the conduct and discipline code adopted by the board of education pursuant to paragraph (a) of subsection (2) of this section shall not have his or her contract nonrenewed or be subject to any disciplinary proceedings, in-

cluding dismissal, as a result of such lawful actions. . . .

§ 22–32–110(4)(c).

This court has been called upon to determine what remedy, if any, the Immunity Statute provides to a District employee who has been dismissed by the District in contravention of this Statute. The majority holds that an employee may challenge a District's ruling only under C.R.C.P. 106(a)(4), which limits judicial review to an abuse of discretion standard. Under the majority's analysis, a District remains empowered to determine whether the Immunity Statute applies in the first instance, to conduct a hearing and create a record under its own procedures, and to terminate the employee based on its own findings. The District's decision would then be reviewed by a court based solely on the record the District itself created, and could only be overturned based on a showing that the termination was arbitrary and capricious, in light of that very record.

Because, in essence, the majority allows the District to determine the limits of its own authority—a function uniquely reserved to the courts—I disagree with its holding. *See Hawes v. Colo. Div. of Insurance,* 65 P.3d 1008, 1015 (Colo.2003) (" 'A cardinal principle of American constitutionalism is that those who are limited by law should not be empowered to decide on the meaning of the limitation: foxes should not guard henhouses.' ") (quoting Cass R. Sunstein, *After the Rights Revolution* 224 (1990)); *Social Sec. Bd. v. Nierotko,* 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946) ("An agency may not finally decide the limits of its statutory power. That is a judicial function."). Rather, because I find that this Statute creates a very specific form of immunity, I would hold that any employee—regardless of employment status and regardless of the nature of procedure initially provided by the School District—who has been dismissed in contravention of the Statute is entitled to de novo judicial review of the District's decision.

**15.** For the purposes of this dissent, I will follow the majority's lead and cite to 1999 statutory references.

## I. ANALYSIS

### A. Immunity

Our primary goal in interpreting a statute is to ascertain and give effect to the intent of the General Assembly. *Concerned Parents of Pueblo, Inc. v. Gilmore,* 47 P.3d 311, 313 (Colo.2002); *Showpiece Homes Corp. v. Assurance Co. of America,* 38 P.3d 47, 51 (Colo. 2001). Where the statutory language is clear and unambiguous, we need not resort to the interpretive rules of statutory construction. *Concerned Parents,* 47 P.3d at 313. However, where, as here, the language of the statute is ambiguous, we may turn to other sources, including the title of the statute, to determine the General Assembly's intent. *Id.* Additionally, we must analyze any ambiguous language in context with, and with regard to, its intended purpose as manifested by the statutory scheme as a whole. *Wilczynski v. People,* 891 P.2d 998, 1001 (Colo. 1995). In doing so, we strive to give consistent, harmonious, and sensible effect to all the Statute's parts. *State v. Nieto,* 993 P.2d 493, 501 (Colo.2000).

Here, although the Statute has failed to provide an express remedy, the title of the Statute makes plain the·General Assembly's intent. The bill which became the Immunity Statute was titled, as introduced and as passed, "A Bill for an Act Concerning the Protection of Persons Acting in Good Faith Under the Discipline Code Adopted by a School District." H.B. 91–1203. Thus, in passing the Immunity Statute, the General Assembly intended to protect District employees from adverse consequences, including dismissal, arising out of their good faith actions.

The majority treats the Statute "as an exception to a school board's discretion in the area of hiring and firing," rather than as a form of immunity for employees, despite the fact that the entire Statute is couched in terms of immunity and despite the fact that the subsection at issue creates an express exemption from a liability—that of adverse employment consequences—so as to fall within the very definition of "immunity" cited to by the majority. Maj. op. at 524–525; *Black's Law Dictionary* 752 (7th ed.1999) (defining "immunity" as "[a]ny exemption from a ... liability...."). I therefore fundamentally disagree with the majority's characterization of the issue before us today.

In my opinion, the Statute in fact creates several forms of immunity—immunity from civil suit, immunity from criminal prosecution, immunity from child abuse charges, and immunity from adverse employment consequences. Indeed, since its initial passage in 1991, the legislature has highlighted its intention that this Statute be treated as an Immunity Statute by adding the title "Immunity" to the subsection we address today. *Cf. BQP Industries, Inc. v. State Bd. of Equalization of State of Colo.,* 694 P.2d 337, 344 (Colo.App.1984) ("[A]lthough subsequent legislative pronouncement of intent is not part of the legislative history, such statements may be considered in construing the statute in question."). Thus, the Statute at issue today plainly creates immunity for school employees, and should be construed accordingly. As with all other forms of immunity, then, we must determine the applicability of this Statute to an employee de novo. *See North Colorado Medical Center, Inc. v. Nicholas,* 27 P.3d 828, 838 (Colo.2001) (reviewing de novo the question of whether a medical center was immune from suit under the Health Care Quality Improvement Act because "immunity under the HCQIA is a question of law for the court to decide").

### B. Insufficiency of Abuse of Discretion Review

Having rejected any sort of immunity analysis, however, the majority instead treats the initial termination decision as a quasi-judicial action because it "certainly involves a determination of the rights, duties or obligations of specific individuals on the basis of the application of presently·existing standards ... to past or present facts." Maj. op. at 527–528; *see Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.,* 757 P.2d 622, 627 (Colo.1988). As such, the majority concludes that the decision is subject to review only under the abuse of discretion standard provided for in C.R.C.P. 106(a)(4). *See Cherry Hills,* 757 P.2d at 622; maj. op. at 528.

Once again, I disagree with the majority's approach under C.R.C.P. 106(a)(4) because the legislature clearly intended to create an immunity with this Statute. However, even if this were not an Immunity Statute, review for abuse of discretion would still be insufficient because the School District's proceedings simply were not quasi-judicial.

While the termination decision resembles, in some respects, a quasi-judicial proceeding, I find that the absence of an impartial decision-maker prohibits such a conclusion or, at the very least, establishes that the purported quasi-judicial proceeding did not comport with due process. A quasi-judicial proceeding must be conducted in accordance with procedural due process. *Soon Yee Scott v. City of Englewood,* 672 P.2d 225, 227 (Colo. App.1983); *see also, e.g., Douglas County Bd. of Com'rs v. Public Utilities Com'n of State of Colo.,* 829 P.2d 1303, 1310 (Colo. 1992) ("When an agency acts in a quasi-judicial capacity, procedural due process requires that the agency give notice and afford a hearing to affected individuals."). Crucial to the notion of due process is that a hearing be conducted by an impartial officer, who is held to the same standards as a judge. *See, e.g., In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); *Wells v. Del Norte Sch. Dist. C–7,* 753 P.2d 770, 772 (Colo.App.1987) ("When administrative proceedings are quasi-judicial in nature, agency officials should be treated as the equivalent of judges."). Although there exists a presumption of integrity, honesty, and impartiality in favor of those serving in quasi-judicial capacities, a party who demonstrates a personal, financial, or official stake in the decision on the part of the decision-maker overcomes that presumption. *See First Bank v. Dep't of Regulatory Agencies,* 852 P.2d 1345, 1353 (Colo.App.1993).

Here, the General Assembly passed the Immunity Statute in order to protect District employees not only from civil and criminal liability, but also from improper termination by the District. § 22–32–110(4)(c). For whatever reason, the General Assembly has determined that employees need to be protected from termination by the District—even where the employee has acted in good faith and in compliance with the District's own discipline code. The majority nevertheless insists that the District itself should be left to determine whether the District is prohibited from terminating an employee under the Statute. Maj. op. at 529–530. Such an interpretation, which assumes that the General Assembly did in fact trust School Districts to act appropriately when faced with such a decision, would render the Statute's protection superfluous. "However, interpretations that render statutory provisions superfluous should be avoided." *People v. Swain,* 959 P.2d 426, 432 (Colo.1998). Thus, although the precise motivation behind this particular subsection is unclear, we should presume that the General Assembly was in fact concerned that a District would terminate an employee out of some perceived need to protect itself—perhaps out of fear of litigation from a student's parents—thereby frustrating the legislative goal of encouraging employees to intervene in potentially violent situations in the schools.

Moreover, the General Assembly's intent to deprive the District of discretion under these very circumstances is made plain by considering the Immunity Statute in light of the greater legislative scheme regarding School Districts and their generally broad authority. *See Wilczynski v. People,* 891 P.2d 998, 1001 (Colo.1995) (holding that the purpose of an ambiguous statute may be determined by reference to the greater statutory scheme). In particular, the Immunity Statute carved out a narrow exception to the otherwise broad discretion given to Districts in the dismissal of employees. As the majority rightfully notes, in the absence of the Immunity Statute, Districts have the specific power "[t]o discharge or otherwise terminate the employment of any personnel." § 22–32–110(1)(h), 7A C.R.S. (2003); *see also* maj. op. at 525–526. In passing this Immunity Statute, the General Assembly created a very explicit safeguard for District employees such that all employees, regardless of the nature of their employment status,[16] should

**16.** The majority focuses on the fact that Mr.   Widder was an at-will employee and on the

be afforded the same degree of protection from dismissal under the Statute. Thus, by placing a direct prohibition on the School Districts, the General Assembly has stripped Districts of their otherwise broad discretion to terminate employees where those employees have acted to further the legislative goal of safer schools. Reviewing a District's decision only for an abuse of discretion therefore defeats the legislative intent of removing from the Districts that very discretion.

Given the General Assembly's determination that such discretion should be removed from School Districts under these circumstances, the District certainly had "an official stake" in the outcome of the termination hearing. *See First Bank,* 852 P.2d at 1345. Thus, I am unable to find even a semblance of impartiality in a proceeding wherein the District itself determines whether the employee is in fact protected from termination by the District. Due to this inherent bias in the decision-maker, the hearing given by the District either is not quasi-judicial in nature, thereby rendering review under C.R.C.P. 106(a)(4) inappropriate, or falls well short of the standards of due process required for a quasi-judicial administrative hearing. Regardless of whether the proceeding below is treated as quasi-judicial, therefore, review only for abuse of discretion is insufficient to protect employees' rights under the Statute.

In fact, this case plainly demonstrates why de novo review, and not abuse of discretion, is necessary under the Immunity Statute. In particular, the glaring disparities between the District's findings and the trial court's findings highlight the pitfalls of deference to a School District's own conclusions. In a one-page memorandum, the District's interim superintendent ruled to uphold the District's recommendation of termination. According to her sole finding of fact, the superintendent concluded "that there was a headbut [sic] and that, based on [her] assessment of the credibility and weight of the evidence, it was deliberate *or* the result of Widder's inappropriate conduct." (emphasis added). Thus, it appears that the "hearing officer" simply re-

affirmed the District's decision to terminate Widder, notwithstanding her own finding that the contact may not have been deliberate.

The trial court, however, reached the opposite conclusion, based on evidence which was equally available to, if not relied upon by, the School District. The trial judge expressly noted that he did not "find any evidence to sustain the notion that the head contact ... was deliberate," rejecting as not credible the testimony of the complaining student—the only witness to testify that the contact was intentional. The trial judge further determined "that the term head-butt originated with [the complaining student] out of desire to take revenge on Mr. Widder...." As such, the trial judge concluded that "Mr. Widder acted in good faith, and ... in compliance with the discipline code which authorizes any employee of the district to intervene and use reasonable force as necessary." Thus, at the conclusion of the de novo review, the trial judge found that the Statute did in fact protect Widder from dismissal by the District. Clearly then, the application of de novo review below served to uphold the protections created by the General Assembly when it passed the Immunity Statute.

In short, the majority's deferential abuse of discretion approach provides no safeguards for the employee who, ultimately, is the one for whom the Immunity Statute was passed. Thus, I believe a stronger remedy, in the form of de novo review of a School District's decision, is necessary in order to effectuate the purpose of the Immunity Statute.

### C. De Novo Review Under Rule 57

Importantly, de novo review is necessary regardless of the proceedings provided at the School District level, if any. A District may simply determine that the protections of the Statute are not triggered at all, or may summarily conclude that the employee did not act in good faith or in compliance with the District's discipline code. Yet, under the majority's approach, it remains unclear what

---

rights accorded to him under his collective bargaining agreement. Maj. op. at 522. However, his employment status is irrelevant to his rights

under the Immunity Statute, which makes no mention of varying protections for various kinds of employees.

remedy, if any, is available to an employee who has been terminated, claims that such termination violates the Immunity Statute, and then is denied even a pre-termination hearing by the District because the District claims that the termination was not based on an action covered by the Immunity Statute.

On the other hand, even taking the majority approach as requiring some form of hearing whenever a colorable claim of protection under the Statute is raised,[17] an employee's rights are still not guaranteed. Allowing the District to make findings of fact, and reviewing its ultimate decision only for abuse of discretion, provides no check on the District's ability to violate the Statute. A District has no incentive to make any factual finding that the employee *did* act in good faith and in compliance with the discipline code, and then to take action against that employee regardless of the factual finding. Yet that is the only scenario wherein an abuse of discretion standard would be likely to overturn the District's post-hearing termination of the employee. Thus, de novo review is essential in effectuating the purpose of the Immunity Statute.

In my opinion, the most appropriate remedy is to allow an employee to challenge the School District's decision under a Rule 57 Declaratory Judgment action.[18] By allowing de novo review through a Rule 57 action, we would ensure that an employee's rights under the Immunity Statute are sufficiently protected.

Under Rule 57, a district court "has the power to declare rights, status, and other legal relations" of the parties involved, and the court's declaration has "the force and effect of a final judgment or decree." Rule 57(a). The rule allows "[a]ny person ... whose rights, status, or other legal relations are affected by a statute" to "obtain a decla-

ration of rights, status, or other legal relations thereunder." Rule 57(b). In particular, "one whose rights are favorably affected by a statute is entitled to seek a judicial determination thereof so long as the court is provided with a properly adverse context." *Silverstein v. Sisters of Charity of Leavenworth Health Serv. Corp.*, 38 Colo.App. 286, 291, 559 P.2d 716, 720 (1976) (holding that declaratory relief was available where plaintiff challenged an employment policy as violating a state anti-discrimination statute). Relief is appropriate under Rule 57 where "C.R.C.P. 106(a)(4) relief is unavailable ... because review of the record is an insufficient remedy." *Grant v. Dist. Court*, 635 P.2d 201, 202 (Colo.1981).

The goal of Rule 57 "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and is to be liberally construed and administered." Rule 57(k). Moreover, "[t]he primary purpose of the declaratory judgment procedure is to provide a speedy, inexpensive, and readily accessible means of determining actual controversies which depend on the validity or interpretation of some written instrument or law." *Toncray v. Dolan*, 197 Colo. 382, 384, 593 P.2d 956, 957 (1979). As such, an action under Rule 57 is appropriate even where another adequate remedy is available. *See* Rule 57(m) ("The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."); *Troelstrup v. Dist. Court*, 712 P.2d 1010, 1012 (Colo.1986) ("The granting of declaratory relief is a matter resting in the sound discretion of the trial court and is not precluded even when there is another adequate remedy.").

In other situations where a school board has violated a statutorily imposed duty,

---

17. Although the majority observes that the employee did in fact receive some form of hearing here, the majority is careful to note that the employee was entitled to that hearing due, at least in part, to his union contract. Maj. op. at 522. The majority further notes that the hearing was inadequate because the superintendent failed to make findings of fact directly relevant to the issue of whether the employee's action was taken in good faith and in compliance with the

discipline code. Maj. op. at 528. However, the majority never clarifies whether a hearing is always necessary and, if not, what degree of process short of a full hearing would be sufficient.

18. Of course, the employee would have to demonstrate a prima facie case of wrongful termination under the Statute or face dismissal of his/her case by the trial court.

teachers have been successful in bringing declaratory judgment actions in order to obtain relief. We upheld a district court's declaratory judgment ordering a non-tenured teacher's reemployment based on the school district's failure to comply with a statute requiring that written notice of termination be given to a non-tenured teacher by a statutory deadline. *School Dist. Re–11J, Alamosa County v. Norwood*, 644 P.2d 13 (Colo. 1982). There, we found that the statute's requirement that written notice be given by a set deadline was not satisfied when the school district merely set into motion "the mechanics of the giving of notice" by that deadline. *Id.* at 15. Because the statute provided that a teacher not receiving such written notice was deemed automatically reemployed, and because the teacher did not actually receive that written notice by the statutory deadline, we upheld the declaratory judgment ordering reemployment. *Id.* at 14.

Similarly, the court of appeals has ordered that a declaratory judgment be entered in a teacher's favor where it found that the defendant school district had violated the teacher's statutory right to tenure. *Day v. Prowers County School Dist. RE–1*, 725 P.2d 14 (Colo. App.1986). The defendant school district argued that they had transferred the teacher's contract to another district, and thereby cut off the teacher's right to acquire tenure under the statutory scheme at issue. *Day*, 725 P.2d at 14. The court of appeals disagreed, finding that the defendant district's transfer of the teacher's contract to another district, while the teacher continued to teach within the defendant district, did not sever the teacher's position as an employee of the defendant district so as to prevent the teacher from attaining tenure under the statutory scheme. *Id.* at 16. Consequently, the court of appeals ordered that a "judgment declaring that [the teacher] has acquired tenure within defendant school district" be entered. *Id.* at 14–15. Thus, declaratory judgments have been brought against school districts in order to interpret and enforce statutorily imposed duties and to protect the rights of those district employees affected by the statutes.

Finally, in a case analogous to the instant case, the court of appeals allowed declaratory relief for a plaintiff challenging two corporations who refused to hire her as a respiratory therapist based on her epilepsy. *Silverstein v. Sisters of Charity of Leavenworth Health Serv. Corp.*, 38 Colo.App. 286, 559 P.2d 716 (1976). Although it ruled that the plaintiff was not entitled to bring a private cause of action under Colorado's relevant anti-discrimination statute because the statute's provision for a criminal penalty necessarily precluded a private right of action, *id.* at 289, 559 P.2d 716, the court of appeals found that declaratory relief was appropriate under the circumstances. *Id.* at 291, 559 P.2d 716. The court ruled that the plaintiff's action "seek[ing] a judgment regarding the applicability of the state act to the challenged employment policy" fell "clearly within the legislative intent." *Id.* Thus, the plaintiff's claim that the defendants' hiring policies unlawfully denied her employment merited declaratory relief under Rule 57, even though the statute had failed to provide for any express private relief, in order to protect the plaintiff's rights and to further the legislative intent.

Here, Rule 57 provides a useful remedy for protecting a District employee's rights under the Immunity Statute. The Petitioner-employee is a person whose rights are affected by the Statute insofar as he is a person who claims to have acted "in good faith and in compliance with the conduct and discipline code adopted by the [Durango School District]" and his employment was terminated by the District as a result of that underlying action. As such, the Petitioner is entitled to bring an action under Rule 57 for a declaration as to whether his dismissal was in violation of the Immunity Statute.[19]

---

**19.** I disagree with the majority's contention that it is only the District's discipline code, and not the Statute, which is at issue. Maj. op. at 528, n. 14. The applicability of the Statute depends on whether the employee acted in good faith, regardless of the code, and also whether he acted in compliance with the code. *See* maj. op. at 528, n. 14. Thus, a determination of rights under the Statute involves more than simple application of a District's code. Moreover, review by an impartial third party is necessary based on a District's inherent bias in applying this Statute to an employee whom it wishes to terminate.

Allowing the Petitioner to seek such declaratory relief would further Rule 57's goal of affording a District employee relief from uncertainty with respect to his rights. Additionally, allowing declaratory relief would further the clear legislative intent of the Immunity Statute by ensuring that the rights of those persons intended to be protected by the Statute are in fact upheld. Moreover, relief under Rule 57 is appropriate because Rule 106(a)(4) relief is either unavailable, because the District's decision to terminate the Petitioner's employment was not quasi-judicial in nature, or ineffective, because the District's decision did not produce an adequate record for the court to review and because the decision was tainted by the inherent bias of the decision-maker. Relief under Rule 57 is available even if we find that relief under C.R.C.P. 106(a)(4) is theoretically available, because Rule 57 does not require the absence of an alternative remedy. Finally, in allowing de novo review under Rule 57, we would avoid the imposition of new and unwarranted "complex procedural safeguards," maj. op. at 525, upon both School Districts and trial courts, and instead allow the employee's rights to be protected under a well-established procedure already provided by our civil rules.

## II. CONCLUSION

Thus, in my view, a District employee alleging that the District's decision to fire him was in violation of his rights under the Immunity Statute is entitled to seek declaratory relief under Rule 57. After conducting a de novo examination of the evidence, a trial court which concludes that the District did violate the Immunity Statute could then, as the trial court did here, impose injunctive relief in the form of reinstatement in order to remedy the violation. I would therefore reverse the decision of the court of appeals and affirm the trial court's order of reinstatement.[20]

I am authorized to state that JUSTICE HOBBS and JUSTICE BENDER join in the dissent.

---

**20.** Although the trial court granted mandamus relief under C.R.C.P. 106(a)(2) rather than declaratory relief under C.R.C.P. 57, the substance of the relief provided—a de novo hearing to assess whether the employee was in fact protected by the Statute—was appropriate. However, I do not believe mandamus relief is proper because "it is an extraordinary remedial process which is awarded not as a matter of legal right, but in the exercise of sound judicial discretion," and is available only when no other effective remedy exists. *Sherman v. City of Colorado Springs Planning Comm'n*, 763 P.2d 292, 295 (Colo.1988). Because Rule 57 declaratory relief provides an effective remedy for violations of an employee's rights under the Statute, resort to the extraordinary relief of C.R.C.P. 106(a)(2) is unnecessary.